# STATE OF MARYLAND *v.* JOHN EDWARD MAHONEY

[No. 101, September Term, 1972.]

*Decided September 11, 1972.*

194

The cause was argued before ORTH, MOYLAN and POWERS, JJ.

*Josef E. Rosenblatt, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Darrel L. Longest, Assistant State's Attorney for Montgomery County,* on the brief, for appellant.

*Floyd Willis, III,* for appellee.

ORTH, J., delivered the opinion of the Court.

## I

JOHN EDWARD MAHONEY (appellee), Will Smith Mahoney and Charles William Van Hoozier were jointly charged in the 1st count in the indictment returned against them with robbing Michael James Breuer with a deadly weapon on 11 August 1967. The indictment presented related offenses set out in six additional counts. John Mahoney was separately tried by a jury in the Circuit Court for Montgomery County. On 14 June 1968 he was convicted under the 1st count and sentenced to 20 years.[1] On direct appeal from that judgment, he

---

1. Van Hoozier pleaded guilty to receiving stolen goods charged by the 7th count. He was sentenced to 5 years. The execution of

claimed only that the indictment was defective because of a misjoinder of counts. Finding no merit in that contention, we affirmed the judgment. *Mahoney v. State,* 6 Md. App. 407.

John Mahoney had the assistance of counsel for his defense at his trial, but he now feels that his counsel was incompetent. Collaterally attacking the judgment, he presented the point in a petition for relief under the Post Conviction Procedure Act, complaining that his counsel failed to call on his behalf witnesses who would have testified that he was home at the time the crime was committed. Following an evidentiary hearing, at which Mahoney and his trial counsel both testified, the court concluded that trial counsel had been incompetent and ordered a new trial. The State filed an application for leave to appeal from that determination. We obtained and reviewed a copy of the transcript of the trial and of the post conviction hearing. We set out what they disclosed in an unreported per curiam opinion filed 17 April 1972, docketed as *State v. Mahoney,* No. 123, Post Conviction, September Term, 1971.

At John Mahoney's trial, Michael Breuer, Manager of McDonald's Restaurant on Rockville Pike, testified that he was held up at gunpoint at approximately 1:00 a.m. or 1:30 a.m. on August 11, 1967 by three masked men as he was leaving the store. He was forced back into the restaurant, the safe was opened and a large sum of money was stolen. Breuer was unable to identify any of the masked robbers.

Steven Wilson, who resided near Mahoney's home, testified that he, together with John Mahoney and his brother Will Mahoney, held up Breuer at the restaurant. He said that they walked to McDonald's, ate there, and then went behind the restaurant and put on face masks. Thereafter, John Mahoney forced Breuer at gunpoint to lie on the floor of the restaurant, emptied the safe of its

---

the sentence was suspended and he was placed on probation for 5 years. Will Smith Mahoney was found guilty by a jury under the 1st count and sentenced to 20 years.

money, and ripped the phone from the wall. They all then ran away on foot, after which they divided the stolen money and John threw the gun under a nearby bridge.

Charles Van Hoozier, also a neighbor of the Mahoney family, testified that shortly after the robbery John Mahoney came to his home and said he had committed a robbery at McDonald's Restaurant. Van Hoozier then accompanied Mahoney to Gaithersburg where Mahoney purchased a car with part of the stolen money. Van Hoozier testified that Mahoney gave money to him to supply him with an alibi. He also admitted hiding in his house money stolen in the robbery. It was subsequently recovered by police who conducted a search of Van Hoozier's house with his permission.

Lonzy Walters, Mahoney's uncle, testified that on the evening following the robbery, Mahoney came to his home; that Will Mahoney and his wife were also present; that they all went riding in John Mahoney's car, at which time John Mahoney said he had committed a robbery at McDonald's Restaurant in Rockville; that they had worn masks over their faces and had taken $1400.00. Walters notified the police and John and Will Mahoney were later arrested.

Both John and Will Mahoney confessed their participation in the robbery to the police shortly after their arrests. In John Mahoney's statement, he admitted participating in the robbery with his brother Will and Steven Wilson. He admitted using a gun which he later threw under a bridge. He said they arrived at McDonald's at approximately midnight, having walked there from his home. He said they used masks over their faces and that after committing the crime, they returned home.[2]

---

2. John Mahoney challenged the admissibility of his alleged statement. Testifying in his own behalf on the limited issue of voluntariness, Mahoney claimed that he was subjected to police threats and improper inducements. He also said he never gave the police a confession. There was evidence before the court that no threats, promises, or improper inducements were made to obtain Mahoney's confession, and it was admitted for the jury's consideration. There was also evidence that Mahoney repudiated his statement shortly after making it.

Evidence was adduced at the trial showing that the robbers' masks were found near the scene of the crime; that the gun was found under a nearby bridge; that Mahoney had purchased a car immediately after the robbery and, when arrested, had $139.00 in his possession.

Mahoney offered no evidence in his defense and the jury found him guilty of armed robbery.

At the post conviction hearing, Mahoney contended that his trial counsel was incompetent "due to the fact that he failed to call to the stand any witnesses on * * * [his] behalf, even though such witnesses were readily available * * * and could afford testimony to the fact that * * * [he] was at his legal place of residence, 13817 Travilah Road, Rockville, Maryland, during the time that the crime that he is presently incarcerated for was committed." Mahoney testified that his father, mother, sister, brother, and sister-in-law would have so testified had they been called as witnesses at the trial, but that trial counsel refused to call these witnesses although requested both prior to and during the trial without assigning any reason for his decision. Mahoney also contended that a gas station attendant named Jim and a friend, Sue Evans, would have testified in support of his alibi, but trial counsel refused to call them as witnesses although requested to do so.

It was Mahoney's testimony that he was in bed at 12:30 a.m. on the day of the crime; that his mother and father were also in bed at that time; that his mother was a light sleeper and would have heard him if he drove away from the house. He said his brother Elwood slept in the same bedroom with him and would provide "an alibi" that he was at home when the crime was committed; that when he (Mahoney) went to bed that night, Elwood was still awake and they talked before retiring. Mahoney further testified that his sister Barbara Ann would have testified that she had seen him "that night," and that his brother Perry would have testified that he saw him working on his car on the night of the crime. Mahoney testified that had Sue Evans been called as a wit-

ness, she would have said that on the night of the crime he had changed some of his money into dollar bills, later found on him when he was arrested; and that the gas station attendant Jim would have testified that he (Mahoney) was working on his car at 10:30 p.m. that night.

Mahoney's mother testified at the post conviction hearing that at 12:30 a.m. on the day of the crime, "as far as I know," her son was at home. She said he had worked on his car earlier that night and came home around 10.30 p.m. She said she didn't recall when she went to bed that night, although she thought it was around midnight, but that her son was still up when she retired. She testified that had her son driven away from the house that night, she would have heard him leave.

Mahoney's sister-in-law (Will's wife) testified that she saw him at home at 11:30 p.m. on the night of the crime. She also testified that she and her husband went to bed at 11:00 p.m. that night.

Mahoney's trial counsel, John Bell, testified at the post conviction hearing that he knew that Mahoney's relatives were prepared to testify to "some type of alibi for him at the time that this alleged offense was to have taken place." Bell said:

> "* * * this presented a difficult situation for the defense attorney or any defense attorney but I think it is abundantly clear that while a defense attorney is an instrumentality by which the defendant's case is presented to the jury and to the Court, the defense attorney cannot take the facts of a case and change them substantially, nor can a defense attorney in any way participate in a fraud upon the Court or lend himself to any perjury or subordination of perjury from the defendant or any other witnesses and for that reason Will Smith Mahoney having indicated to me that he and his brother had done this, I don't believe that John Mahoney had told me of his involvement, actually admitted it, al-

though it was abundantly clear from all of the evidence, it seemed appropriate to me as a tactical maneuver not to protect for the record everything that had been admitted into evidence, to protect all of the exceptions and objections that had been made and to stand on the record as it was and not to bring any fabrication or lies or any other false, spurious, counterfeit facts before the Court or before the jury."

Bell testified that Will Mahoney had admitted to him committing the crime and implicated John. Bell said he interviewed all witnesses that Mahoney asked him to interview; that he didn't recall their names but thought the mother and other relatives were among such prospective witnesses. Asked by the court whether he declined to call alibi witnesses because he thought such witnesses would be lying, Bell answered in the affirmative, and said he so told Mahoney. The court then asked:

"Are you the judge? Are you supposed to make that judgment as to whether or not their testimony would be perjured?"

Bell responded:

"Your Honor, I don't know whether I am the judge or not but if one of the defendants has admitted to me that he had committed the offense and if in interviewing all of the State's witnesses, including the relatives, would lead a reasonable person to believe that the testimony would be false—."

The court rejoined:

"Isn't the jury the judge? Isn't the jury entitled to hear the testimony of the defendant's witnesses and then reach its own judgment as to who is telling the truth and who isn't?"

Bell answered:

"I would take the position that I am not going

to put on any witnesses, including the defendant, who I think is going to give perjured testimony."

The court granted Mahoney a new trial. It stated that under Maryland law "failure to call witnesses, going to the competency of counsel," is a ground upon which post conviction relief may be granted if it amounts "to more than a tactical judgment and it must amount to depriving * * * the defendant at his trial of due process." The court found as a fact that Bell's reason for not calling Mahoney's alibi witnesses was because he thought "they would be lying" and Bell "didn't want to be part of it." The court also found as a fact that Mahoney asked Bell to summons his mother, father, sister, a brother, his sister-in-law, the gas station attendant and Sue Evans, but that Bell refused to call them as witnesses. The court said that Mahoney's testimony was that his brother Elwood, had he been called as a witness, would have testified that Mahoney was either in bed or asleep at about the time the crime was committed. The court summarized the post conviction testimony of Mahoney's mother and sister-in-law; it noted that while neither could testify where Mahoney was "at precisely the time when the alleged offense was committed," their testimony at the trial "would have had some probative value." The court held that Mahoney "had a constitutional right to have his so-called alibi witnesses present, and if he insisted upon it, to have them take the stand and to have the jury, not the lawyer, decide whether their testimony was credible or not." The court concluded that Bell's failure to accede to Mahoney's wish "to have his alibi witnesses testify for him * * * deprived * * * [him] of due process"; that if Bell "didn't like the way his client was insisting that the case be tried, he should have withdrawn his appearance, should have petitioned the Court to relieve him of the obligation to defend."

The State applied for leave to appeal. It claimed that due process of law was not offended by Bell's failure to

call the so-called alibi witnesses to testify at the trial. The State maintained that "the authorities are legion which hold that the failure or neglect of trial counsel in calling or not calling witnesses, even if material, does not afford grounds to support a claim of inadequate representation." The State contended that the "calling of different witnesses is a matter of trial tactics and even if the tactics prove to be wrong, a denial of the right to * * * [competent] counsel * * * is not shown short of a clear allegation and proof of a factual situation showing that the representation of counsel reduced the trial to a farce or sham." Of course, as we pointed out in our opinion of 17 April 1972, the State's reliance upon the "farce or sham" test was misplaced; that test for assessing the constitutional adequacy of trial counsel is no longer the law of this State. See *Slater v. Warden*, 241 Md. 668, and *Green v. Warden*, 3 Md. App. 266, noting, as indicated *infra*, that the proper test for determining the competency of trial counsel is whether, under all the circumstances of the particular case, counsel was so incompetent that the accused was not afforded genuine and effective legal representation.

The State also contended in its application that the so-called alibi witnesses would not have assisted Mahoney in his defense because their testimony would not have established Mahoney's whereabouts at the time the crime was committed.

Responding to the State's application for leave to appeal, Mahoney acknowledged that while there was an overwhelming amount of evidence pointing to his guilt, most of it was elicited from alleged participants in the crime and from his own statement, which he denied making. He claimed that at the end of the State's case, "there could have been no question that the jury would convict"; that his only possibility of escaping a conviction was to produce alibi witnesses; and that whether such witnesses were to be believed was a matter solely for the jury. Mahoney argued that Bell's decision not to call witnesses was by no stretch of the imagination "trial

tactics." He claimed that "there was nothing to lose and conceivably much to gain by placing a doubt as to the credibility of the State's witnesses in the minds of the jury"; and argued that the testimony of the alibi witnesses "at the very least creates an inference that he was in bed at the time the offense was committed." Mahoney concluded by urging that Bell's refusal to call his alibi witnesses amounted to a denial of due process of law and correspondingly amounted to incompetence on trial counsel's part.

Because we felt that the issues presented were "of far-reaching importance," we granted leave to appeal, transferred the case to our regular appeal docket and directed that it be fully briefed and orally argued before us on two questions which we posed as follows:

"(1) Whether, in the circumstances of this case, Mahoney's Fourteenth Amendment rights to the effective assistance of counsel and to due process of law were denied him by reason of Bell's refusal to call the so-called alibi witnesses to testify on his behalf at the trial.

(2) Whether, in the circumstances of this case, viewed in light of the provisions of Maryland Rule BK45 directing that the post conviction hearing judge 'make such order on the petition as justice may require,' Bell's refusal to call the alibi witnesses justifies the granting of a new trial."

The State maintains that Mahoney's trial counsel acted properly in not calling the alleged alibi witnesses and that even if the failure to call them was error, the error was harmless. Mahoney claims that as his counsel was "obligated to present all evidence available to [his] defense, which was of probative value, unless he knew that such evidence was perjured," the failure to do so was error and that the error was not harmless beyond a reasonable doubt.

## II

We find that trial counsel's refusal to call the alibi witnesses did not require the grant of a new trial in the interest of justice. In so concluding we assume, *arguendo*, that the refusal to call the witnesses was an improper exercise of judgment. But even if it were improper, we believe that the impropriety was not such as to deny Mahoney the effective assistance of counsel or due process of law. Thus it provides no ground for the invoking of Rule BK45 to grant a new trial.

Mahoney does not dispute the sufficiency of the evidence to establish the *corpus delicti* of the crime; his contention runs to the proof of his criminal agency. He asserts that his father, mother, sister, brother, sister-in-law, a gas station attendant named Jim, and a friend, Sue Evans, would each have testified that he was elsewhere when the robbery was committed, thus refuting that he participated in the commission of the robbery. However, at the post conviction hearing, of all the alleged alibi witnesses, he offered only his mother and sister-in-law. His mother, asked if she had any recollection where John Edward Mahoney was on 11 August 1967 at 12:30 a.m.,[3] said, "He was at home as far as I know." The transcript reads:

"[by Mahoney's counsel]
Q. What makes you say that?
A. He was working on his car; before that time, before he, when he came home he, I didn't know him to go back out again.
Q. What time did he come home after working on his car?
A. I think it was around until 10:30 somewhere around in there. It has been so long ago, I don't remember, but he came home from working on his car.
Q. 10:30 at night?

---

3. The victim testified that the robbery occurred approximately 1:00 or 1:30 a.m.

A. Yes.

Q. Where did he go when he came home?

A. He didn't go out any more as I know of.

Q. What time did you go to bed that evening, the evening of the 10th of August; do you recall?

A. No, I don't.

Q. Do you recall whether he was still up when you went to bed or—

A. He was still up when I went to bed.

Q. He was still up when you went to bed, and whether he went at 8:00 o'clock at night or 7:00 o'clock—

A. He was working on his car.

Q. Were you up when he came home?

A. Yes, I was.

Q. And you think that was about the time?

A. I think around 10:30, 11:00, I don't know exactly; it has been so long ago, my memory is not too good.

\* \* \*

Q. When was the next time you saw your son, John after, say, you went to bed on the evening of August 10, 1967? Did you see him the next morning or not?

A. Yes, sir.

Q. Where did you see him the next morning?

A. He was home.

Q. Where did you see him, in bed or at breakfast or where?

A. At breakfast.

Q. What time was that, approximately?

A. I don't know."

Upon inquiry by the court it was elicited that when the mother went to bed "about midnight" Mahoney was still there. He had an automobile he could drive. She supposed she would have heard "that automobile if it had left."

Mary Helen Mahoney [4] was John Mahoney's sister-in-law (she was married to Will Smith Mahoney) and first cousin. At the hearing she was examined by the court. She said that on 10 and 11 August 1967 she was living at 13817 Travilah Road with her mother-in-law and father-in-law. John Mahoney was also living at that same house then. The transcript reads:

"Q. Do you have any recollection of having seen John Edward Mahoney on the evening of August 10 or the early morning of August 11, 1967?

A. Yes, sir.

Q. Tell me when you saw John Edward Mahoney. Was it on the evening of August 10, 1967?

A. I saw him that night and also that morning.

Q. And where did you see him that night and what time that night did you see him?

A. It was about 11:30 that night that I saw him.

Q. Where did you see him?

A. At home.

Q. Had he been at home all that evening or had he been out part of the evening?

A. Him and my husband both went out working on his car that night.

Q. How far away was the car, in the driveway or in the gas station?

A. On Travilah Road in a gas station.

Q. How far away from the house?

A. I guess about half a mile.

Q. Did you see them working there?

A. No, I didn't. My husband—

Q. How do you know they were working there?

A. My husband told me.

Q. When did they get back from the gas station where they supposedly had been working on his car? What time in the evening?

4. She testified at John Mahoney's trial out of the presence of the jury on the issue of the voluntariness of Mahoney's confession.

A. I think it was about a quarter to eleven.

Q. Tell the Court whether or not you saw John Edward Mahoney in the early morning of August 11, 1967?

A. I saw him about 8:00 o'clock that morning.

Q. When did you last see John Edward Mahoney on the evening of August 10?

A. It was before I went to bed.

Q. And when did you go to bed?

A. 11:00 o'clock.

Q. When you went to bed at 11:00 o'clock in the evening on August 10, 1967 where was John Edward Mahoney?

A. He was at home.

Q. And he had not gone to bed; I gather he was up?

A. Yes.

Q. So I gather that you did not see John Edward Mahoney from the time you went to bed at about 11:00 o'clock on the evening of August 10, 1967, until about breakfast time of August 11, 1967, which would be around 8:00 o'clock, is that right?

A. Right.

Q. And when did you see your husband last on the evening of August 10, 1967?

A. Do I have to say anything about it? He is my husband.

Q. I don't see why not. It couldn't incriminate you. You are not entitled to answer if something would incriminate you.

A. That is true, but—

Q. Your husband is serving twenty years. He has already been convicted.

A. Yes, he is. I saw him, the last time I saw him is when we went to bed and that was at 11:00 o'clock.

Q. Did he go to bed with you?

A. Yes, he did.

Q. And did he sleep with you that whole night?

A. As far as I know, he did.

Q. When did you next see him?

A. It was when I woke up, 8:00 o'clock that morning.

Q. Where was he when you woke up?

A. He was already up.

Q. He was not in the bed?

A. No.

Q. You can't say of your own knowledge where Mr. John Edward Mahoney was at 12:30 or one or 1:30 in the morning?

A. No, I don't.

Q. Of August 11, 1967."

As Mahoney stated in his Memorandum in Opposition to State's Motion for Leave to Appeal "a reading of the transcript in [his] trial produces an overwhelming amount of evidence pointing to [his] guilt." We think it patent that the testimony of his mother and sister-in-law did not show that he was at home at the time the crime was committed or that he could not have been a participant. None of the other alleged alibi witnesses were produced at the hearing and that their testimony would have tended to show that Mahoney was elsewhere when the robbery occurred remains as a bald assertion by Mahoney. Therefore, on the record before us, considering the evidence adduced at the trial, the failure to call the so-called alibi witnesses, even if an improper exercise of judgment on the part of Mahoney's attorney, was not so prejudicial, beyond a reasonable doubt, as to deny him the effective assistance of counsel or due process of law. We conclude that it did not justify the granting of a new trial.

### III

In the Memorandum Opinion accompanying its order the hearing court said:

"It has been further stated that the counsel was incompetent in that after the trial and sen-

tencing of the Petitioner, trial counsel failed to request a review of the sentence by a Sentence Review Panel."

The court thought this "indicative of incompetency on the part of counsel." But it recognized that "this, of course, does not go to the issue of whether or not [Mahoney] was fairly convicted * * *." We bring the matter up only because Mahoney discusses it in his brief. Rule 719 b 6 provides that appointed counsel shall advise the accused concerning his right to apply for a review of his sentence. But counsel shall assist in the preparation of an application for review of sentence only if directed by the accused. We have held that the duties imposed on appointed counsel by the Rule are imposed on privately retained counsel. *Murray v. Director,* 8 Md. App. 400, 401; *Evans v. Warden,* 8 Md. App. 26, 27. Even if the point were properly before us here, at best Mahoney would be entitled to file a belated application for review of sentence provided his trial counsel had not advised him of the right to file an application for sentence review and provided his counsel had not assisted in the preparation of such application after being directed by the accused to do so.

## IV

In the petition for post conviction relief as amended eleven allegations of error were presented in addition to that concerning competency of counsel. The hearing court found that those eleven contentions afforded no grounds for the relief prayed. The application for leave to appeal was filed by the State and as it went only to the issue of competency of counsel, the other eleven contentions are not before us.

*Order of 27 September 1971 setting aside the conviction of John Edward Mahoney in criminal 8850 and granting a new trial is reversed. Mandate to issue forthwith.*